UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 4:05CR00272 CEJ (AGF) |
| DEMETRICE DAILEY, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the motion to suppress evidence (Doc. No. 41) filed by Defendant, Demetrice Dailey. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). An evidentiary hearing was held on July 21, 2005. The government was represented by Assistant United States Attorney Thomas J. Mehan. Defendant was present and represented by his attorney, Assistant Federal Public Defender Janis C. Good. At the hearing, the government presented the testimony of Detectives Leo Liston and Wendell Ishmon, both of whom are employed with the St. Louis Metropolitan Police Department (SLMPD). The witnesses were cross-examined by defense counsel. The parties were granted leave to file post-hearing memoranda directed to the issue of standing, after which the matter was taken under submission. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

On April 27, 2005, Detectives Liston, Ishmon, and Disterhaupt were on duty with the SLMPD. Det. Liston has been with the SLMPD for five years, assigned to the narcotics division. Det. Ishmon has been with the SLMPD for approximately nine years, and has been assigned to the narcotics division for approximately five years. On April 27, 2005, at approximately midnight, the detectives went to the Shell station at the 700 block of North Tucker, in St. Louis, Missouri. They were investigating complaints the police had previously received of narcotics activity on and around the parking lot at the Shell station, but they had no specific information regarding any particular individuals. The detectives were in plain clothes, driving unmarked vehicles, and began to conduct surveillance at the station. Det. Liston, who was driving one vehicle with Det. Ishmon in the passenger seat, parked on the street directly south of and adjacent to the Shell station. Det. Disterhaupt was driving a separate vehicle and stationed his vehicle across from the Shell station.

After conducting surveillance for between 15 minutes to one hour,[1] they saw a Ford Taurus drive onto the lot. After entering the lot, the Taurus paused and then drove off. Approximately two to three minutes later, the Taurus returned and parked north of the entrance to the service station/convenience store. It was close to 1:00 a.m., and there

---

[1] Det. Liston believed they had been conducting surveillance for approximately one hour. Det. Ishmon repeatedly said he was uncertain how long they had been conducting surveillance before the activity giving rise to this matter began, but believed it was 10-15 minutes. The exact time they had been conducting surveillance prior to the activity giving rise to these charges is not material to the Court's determination.

-2-

were no other cars parked in the area at the time. The lot was well lit, and the detectives observed the driver, later identified as Mr. Adkins, exit the Taurus, go inside the service station/convenience store, look around, and then come out. Adkins then got something from his car, returned to the store, and then came back out using his cell phone. He thereafter "milled around" on the parking lot. Approximately three to five minutes later, a red minivan Laclede cab pulled onto the lot and stopped next to the Taurus. The detectives were unable to see who was driving the cab and could not see if there were any passengers in the cab. Adkins walked over and got into the backseat of the cab, on the driver's side.

Based on their experience as trained narcotics detectives, the detectives suspected that Adkins might be conducting a drug transaction, or was perhaps planning to rob the store. They found it particularly suspicious that Adkins was getting into a cab even though he had driven his own car onto the lot just minutes earlier, and his car appeared to be in good working order.

The detectives drove their cars onto the lot to investigate Adkins' behavior. Det. Liston pulled his car behind the cab, which was still stopped. Det. Liston approached the side nearest Adkins, while Det. Ishmon walked to the passenger side of the cab. Both detectives were carrying flashlights, which they used to look inside the cab. Neither detective displayed his firearm. As he approached the cab, Det. Liston thought he saw an individual, later identified as Defendant Dailey, who was seated on the passenger side of the cab, making furtive movements, as though he were reaching down to the floor of the cab. Det. Liston announced that there might be a gun. Based on his training and

experience, he was aware that those involved in narcotics transactions often carried firearms. In the meantime, Det. Disterhaupt also pulled up and joined Det. Ishmon on the passenger side of the cab, where Defendant was sitting.

Det. Liston opened the back door of the cab on the driver's side and ordered Adkins out of the cab, while Det. Ishmon opened the rear passenger-side door. Det. Liston could see that Defendant was wearing gloves. Det. Ishmon, who was next to Defendant, also observed that Defendant was wearing gloves, and saw Defendant lean forward and put two guns on the floor of the cab. He yelled to the other detectives when he saw the guns. Det. Ishmon told Defendant to step out of the cab and placed him in handcuffs. Det. Ishmon then returned to the cab and seized the two firearms. He attempted to clear the firearms of their ammunition, but was unable to clear at least one of the guns. He then put the firearms in Det. Disterhaupt's vehicle. One of the detectives secured the driver, later identified as Mr. Lee, and located another firearm on Lee. Either back at the station or at the scene, the detectives ran Defendant's record and determined that there were two warrants outstanding for his arrest.

## CONCLUSIONS OF LAW

A. **Initial Stop of the Cab**

No seizure within the meaning of the Fourth Amendment took place when the detectives initially approached the cab, which was already stopped at a public place, and used their flashlights to look inside. United States v. Barry, 394 F.3d 1070, 1075-76 (8th Cir. 2005); United States v. Angell, 11 F.3d 806, 807, 810 (8th Cir. 1993). The government does not contest, however, that a "seizure" occurred when the detectives

approached on both sides of the cab and opened the backseat doors. The government further concedes that Defendant, who was a passenger in the cab, has a sufficient privacy interest to contest the lawfulness of his own detention. United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000) ("a taxi fare . . . has a reasonable expectation that he will not be gratuitously be seized while in route"); Townes v. City of New York, 176 F.3d 138, 144 (2d Cir. 1999) (finding "clearly established" the right of taxicab passenger to be free from unreasonable seizure). See also Rios v. United States, 364 U.S. 253, 261 (1960) (addressing merits of Fourth Amendment seizure of taxicab passenger).

Police officers may briefly stop a vehicle for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). The reasonable belief requires suspicion based on "'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). Although each factor alone might appear innocent, a combination of factors may warrant further investigation when viewed together. United States v. Sokolow, 490 U.S. 1, 9-10 (1989); United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002).

Here the police were conducting surveillance, in the middle of the night, at a location where they had previously received citizen complaints of drug trafficking. Adkins drove onto the parking lot, paused, drove off, and then returned a few minutes later. After he parked, he continued to engage in suspicious behavior, going first inside the convenience store, returning to his car to retrieve something, and returning to the store where he walked around. He then came back outside, talking on his cell phone, and milled around outside. He thereafter entered the backseat of a cab that pulled up right next to his car, even though his own car appeared to be in good working order. As Det. Liston approached, he also observed furtive movements by Defendant.

In light of these facts, it was objectively reasonable for trained narcotics officers to believe that Adkins and Defendant were engaged in a drug transaction or were perhaps planning to rob the store, and they were justified in stopping the cab to investigate their conduct. See United States v. Bustos-Torres, 396 F.3d 935, 942-43 (8th Cir. 2005) (reasonable suspicion for Terry stop where officers, in area known for drug activity, saw individual entering defendant's car after same individual had been seen conducting probable drug transaction with another car a few minutes earlier); United States v. Spotts, 275 F.3d 714, 718, 720 (8th Cir. 2002) (reasonable suspicion to stop defendant and ask him to get out of truck where truck had been seen driving by residence that police were searching for methamphetamine lab, and the officers had intelligence reports that the defendant dealt methamphetamine); United States v. Dupree, 202 F.3d 1046, 1049 (8th Cir. 2000) (reasonable suspicion based on anonymous tip regarding large group dealing drugs in alley, confirmed in part by officers' observation of five individuals in alley);

United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998) (reasonable cause to stop defendant where driver met with known drug dealer and departed with gym bag).

In connection with the stop, the detectives were also justified in requiring Adkins and the Defendant to get out of the cab. Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (police may order driver to step out of car during routine Terry stop of vehicle); Terry, 392 U.S. at 22-24 (police may stop individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons); Spotts, 275 F.3d at 719 n.2 ("Officers who have conducted a lawful Terry stop of a vehicle may order the driver to exit the vehicle pending completion of the stop."). It was especially justified here, as it was late at night, there were three individuals found in the cab, and the detectives were investigating possible narcotics activity.

Once the detectives observed Defendant with gloves on, in late April, and observed him attempting to conceal the two firearms on the floor of the cab, they had probable cause to arrest him for unlawful use of or trafficking in firearms. See United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) (probable cause to arrest individual whose actions were consistent with someone conducting surveillance for another observed making a drug transaction).

### B. Seizure of the Gloves and Firearms

The government asserts that because Defendant was simply a passenger, he lacks standing to suppress the search of the taxi. Defendant bears the burden of proving that he had a legitimate expectation of privacy in the area or the object searched. See Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); United States v. Pierson, 219 F.3d 803, 806 (8th

Cir. 2000). The law is clear that passengers have no reasonable expectation of privacy in passenger vehicles that do not belong to them. Rakas v. Illinois, 439 U.S. 128, 148-49 (1978); United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001). It is not as clear, however, that the same applies where, as here, the individual is a passenger in a taxi for hire,[2] and the government has cited no cases for this proposition that hold that the privacy interest of an individual in a taxi for hire is the same as that of a passenger in a passenger vehicle. Courts have found that individuals who rent cars have a reasonable expectation of privacy in the rental vehicle, United States v. Smith, 263 F.3d 571, 586-87 (6th Cir. 2001); United States v. Walker, 237 F.3d 845, 849 (7th Cir. 2001), which expectation may continue even after expiration of the rental agreement. See United States v. Henderson, 241 F.3d 638, 647 (9th Cir. 2000). And at least one district court has held that a passenger in a taxi for hire has a sufficient expectation of privacy and right to exclude others to contest a Fourth Amendment search and seizure. United States v. Santiago, 950 F. Supp. 590, 598 (S.D.N.Y. 1996).

Though an interesting question, it is not necessary for the Court to determine the extent of Defendant's expectation of privacy, for even assuming Defendant possesses a sufficient privacy interest, the detectives were authorized to observe and seize the firearms on several independent grounds. First, in light of all of the facts, including

---

[2] It is quite possible under these facts that Lee and Defendant were jointly engaged in some form of illegal conduct, and that Defendant, rather than a paying customer, was more akin to a mere passenger in a vehicle being driven by Lee. Neither party presented any evidence as to the true nature of the relationship between Defendant and Lee, however, and the Court will therefore assume the relationship was consistent with a normal taxi for hire.

Defendant's furtive movements, the detectives were authorized to check the passenger compartment for their own safety. United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001). Moreover, prior to any arrest of Defendant, the detectives observed both Defendant's gloves and the two firearms in plain view. United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997). The firearms were therefore subject to seizure both for officer safety and as contraband. United States v. Hensley, 469 U.S. 221, 235 (1985) (police entitled to seize evidence in plain view during lawful stop); Chimel v. California, 395 U.S. 752, 763 (1969) (police authorized to search "area from within which [arrestee] might gain possession of a weapon"); United States v. Murphy, 261 F.3d 741, 743 (8th Cir. 2001) (police authorized to seize items in plain view when incriminating character of objects is immediately apparent); Weinbender, 109 F.3d at 1330 (same). Additionally, the cab was searched incident to the lawful custodial arrest of Defendant after he was seen in possession of the two firearms. See Hensley, 469 U.S. at 235-36; New York v. Belton, 453 U.S. 454, 460 (1981); United States v. Edmisten, 208 F.3d 693, 694 (8th Cir. 2000), cert. denied, 531 U.S. 1179 (2001); United States v. Williams, 165 F.3d 1193, 1195 (8th Cir. 1999). And the gloves and firearms were therefore subject to lawful seizure incident to Defendant's arrest. United States v. Robinson, 414 U.S. 218, 224, 235

(1973).³  As such, there is no basis to suppress either the firearms or the gloves seized from Defendant.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence [Doc. No. 41] be **denied**.

The parties are advised that they have ten (10) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 1st day of August, 2005.

---

³ The government further asserts that the firearms were abandoned by Defendant, but the Court is not persuaded.  See Rios, 364 U.S. at 262 n.6  ("A passenger who lets a package drop to the floor of the taxicab in which he is riding can hardly be said to have 'abandoned' it.  An occupied taxicab is not to be compared to an open field . . . or a vacated hotel room." (citations omitted)).

-10-